IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LAMONTE R. YOUNG, SR., | |
| Plaintiff, | |
| v. | Case No. 22-cv-229-JPG |
| PROGRESSIVE TREATMENT SOLUTIONS, LLC, | |
| Defendant. | |

**MEMORANDUM AND ORDER**

I.   Introduction

This matter comes before the Court on Defendant Progressive Treatment Solutions, LLC ("Defendant" or "PTS") Motion for Summary Judgment (Doc. 46). Plaintiff LaMonte R. Young, Sr. ("Plaintiff" or "Young") filed a response in opposition to PTS' motion. (Doc. 49). PTS has not filed a reply and the time for doing so has passed.

II.   Factual and Procedural Background

Young brings this claim against PTS for race discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Illinois Human Rights Act ("IRHA"), and 42 U.S.C. § 1981 ("Section 1981"). Young also alleges that PTS violated Sections 15(b) and 15(c) of the Illinois Biometric Privacy Act ("IBPA").

On September 26, 2019, PTS hired Young, an African American, as a Security Officer and Transportation Driver in the Security and Transportation Department of its East St. Louis, Illinois facility. *See* Defendant's Statement of Undisputed Material Facts ("SOF"), Doc. 48 at ¶¶ 1, 7. PTS is a cultivation and manufacturing facility providing quality medical cannabis to patients in Illinois. SOF at ¶ 2. Young got this job after Patrick Jackson, also an African American, contacted

1

Young about the job opportunity. SOF at ¶ 6. Mr. Jackson is Assistant General Manager and Manager of Transportation and Security at the East St. Louis facility. SOF at ¶ 4. Young knew Mr. Jackson because Mr. Jackson is friends with Young's first cousin, Corey Dent, who also works at PTS and is African American. SOF at ¶ 6. After Young applied, interviewed, and accepted a position of Security Officer and Transportation Driver where he directly reported to Mr. Jackson. Andy Halencak ("Mr. Halencak") (White) is the facility's General Manager. SOF ¶ 4.

As Security Officer and Transportation Driver, Young was responsible for watching cameras, performing rounds, loading trucks, delivering loads to different dispensaries in Illinois. Young would make these deliveries with other employees, who were comprised mostly of other African Americans and at the time of Young's termination, comprised entirely of African American. SOF at ¶¶ 5, 14.

On November 22, 2019, Young executed PTS's Biometric Information Privacy Policy for the use of his biometric information. SOF at ¶ 59. After the execution, Young clocked in and out using a Paychex, which uses an individual's finger to clock in and out. SOF at ¶¶ 64-66.

When Young began his employment at PTS in September 2019, he received positive performance views from Mr. Jackson, who approved him for four raises. He began his employment at $15.00/hour and was earning $19.00/hour by the end of his employment. SOF at ¶¶ 17-18. Additionally, Mr. Jackson approved many hours of overtime. SOF at ¶ 16. According to Young, Mr. Halencak recommended Young to be a manager in "bottling."[1] (Doc. 49 at 2). According to PTS, his performance worsened after six months. SOF at ¶ 20. PTS indicates that Young received multiple verbal reprimands regarding unauthorized stops while making product deliveries, shopping, drinking alcohol while riding as a passenger, and taking extended lunch breaks. SOF at

---

[1] The Court is unclear what "bottling" refers to and Young's statement of facts do not provide context of what this job entails.

¶ 23.[2] Plaintiff disputes that he was given any verbal reprimands and was "friends" with those involved. (Doc. 49 at 1). However, PTS did not have any written reprimands. SOF at ¶ 19, Doc. 49 at 1. Young's driving partner, Jason Fiedler, who is white, testified to witnessing Young do the following while at work: purchasing a personal vehicle, watching pornography in PTS vehicle, and drinking alcohol. SOF at ¶¶ 54-57. Young disputes that any of this behavior occurred. (Doc. 49 at 3). Specifically, Young states that he did stop at a dealership in Rockford to ask questions about a vehicle he had purchased, which took no more than ten to fifteen minutes during lunchtime. (Doc. 49 at 3). However, Young further states Mr. Fiedler also had stopped at a dealership where he purchased a sports car he is currently driving. *Id*. Additionally, Young's cousin Mr. Dent and Stan Frigali complained to Mr. Jackson over Young's smoking marijuana in a company vehicle. SOF at ¶ 21. Young disputes these incidents occurred.

Mr. Fiedler was transferred before Young was terminated. Mr. Fiedler was hired in 2019 in the Security and Transportation Department until November 2020 when he had an issue involving his driving partner. SOF at ¶ 50. Mr. Fiedler indicated he wanted to work in the Cultivation Department and was transferred. SOF at ¶ 49. In the Summer of 2021, Mr. Fiedler requested a transfer back to the Security and Transportation Department. *Id*. PTS indicates that Mr. Fiedler transferred into a different department because of Mr. Jackson's cursing and because of an issue he encountered with another employee within the department. SOF at ¶ 48. Young indicates Mr. Fiedler was able to go to HR to seek resources how to deal with a situation with a co-worker. (Doc. 49 at 1). Young indicates he was not given the same kind of proper investigation or type of treatment that Mr. Fiedler was allowed. *Id*.

---

[2] In Young's response, he admits to taking a break for up to fifteen minutes for a vehicle he was trying to buy.

Young indicates there were three separate incidents that provide context on the type of workplace PTS was. (Doc. 49 at 2-3). One incident involved a joke regarding the Super Bowl where Young alleges Mr. Jackson overreached over bets made in 2019. The second incident was on March 31, 2021, involved when Mr. Jackson escalated an issue regarding Young texting about food in a group text. *Id*. at 2. The third incident Young indicates that got in trouble for trying to buy gifts and birthday presents for other employees and got in trouble. *Id*.

On May 15, 2021, Mr. Jackson held a meeting for the Security and Transportation Department employees. SOF at ¶ 25. According to Mr. Jackson, the intention was to help employees resolve ongoing disputes. *Id*. Young indicates that "the meeting did get out of control because Patrick Jackson stated that we could curse, and name drop." (Doc. 49 at 4). Mr. Jackson states that he did not inform employees they could curse. SOF at ¶ 25. Mr. Jackson ended the meeting "when it was clear …that the meeting would not resolve the issues amongst the employees." SOF at ¶ 27. Young, Mr. Jackson, and others stayed on the premises in a friendly way and smoked cigars. *Id*. Young indicates that they also had alcoholic beverages, which he indicates is also a fire-able offense. (Doc. 49 at 4).

On May 16, 2021, Mr. Jackson's son and fellow Security and Transportation employee, QueAnthonee Jackson, reported to his father Mr. Jackson that he and Young smoked marijuana together on multiple occasions while making product deliveries in a company's vehicle. SOF at ¶ 31. Mr. Jackson issued his son a Final Warning and suspended him but did not terminate him because he self-reported. SOF at ¶ 43. That evening Mr. Jackson sent Young a text message on the evening of May 16 requesting to speak to Young first thing in the morning of May 17. SOF at ¶ 32. In return, Young called and sent a text message to Mr. Halencak on the evening of May 16, which he did not respond to. SOF at ¶ 33.

On May 17, Mr. Halencak and Mr. Jackson arrived to work approximately at 5:00 a.m. Mr. Halencak asked Mr. Jackson if he knew why Young would contact him on a Sunday evening and Mr. Jackson indicated that his son self-reported to smoking marijuana with Young while making product deliveries and informed Mr. Halencak he thought Young's employment should be terminated. SOF at ¶ 36. Mr. Halencak and HR agreed with the decision. SOF at ¶ 37. Later in the morning, Mr. Jackson and a Security Officer Julyon Brown approached Young in the parking lot facility when he came to work. Mr. Jackson terminated Young, effective immediately. SOF at ¶ 38. According to PTS, Young became combative. According to Young, he stated the reason that Mr. Jackson gave for his termination was that Young violated "verbal protocol" by calling and texting Mr. Halencak. Young requested to speak to HR and Mr. Jackson indicated that HR already knew Young was being terminated. (Doc. 49 at 5).

On February 9, 2022, Young filed a complaint in this Court. (Doc. 2). After Young requested recruitment of counsel and leave to proceed IFP, the Court assigned him counsel. On January 12, 2023 and January 16, 2023, both Young and his counsel requested that counsel be withdrawn from this case which the Court granted. On January 20, 2023, PTS filed for summary judgment. Young, proceeding *pro se*, opposed the motion. The Court now addresses the merits of the instant motion.

### III. Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Spath v. Hayes Wheels Int'l–Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). If the moving party has demonstrated the absence of a disputed material fact, then the burden shifts to the nonmoving party to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012).

IV. **Analysis**

a. **Title VII, Illinois Human Rights Act, and Section 1981 – Race Discrimination**

Title VII of the Civil Rights Act of 1964 makes it unlawful "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "an unlawful employment practice is established when the complaining party demonstrates that race ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). Title VII apply to claims under the Illinois Human Rights Act. *Reed v. Freedom Mortgage Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) ("Illinois courts apply the federal Title VII framework to claims of discrimination made under the Illinois Human Rights Act."). The question for a Court considering a claim for discrimination under Title VII (or the Illinois Human Rights Act) is "whether the evidence would permit a reasonable fact-finder to conclude that [plaintiff] was subjected to an adverse employment action based on a statutorily prohibited factor." *McCurry v. Kenco Logistics Serv., LLC*, 942 F.3d 783, 788 (7th Cir. 2019).

Of course, the Seventh Circuit has not overruled the Supreme Court's decision in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and, thus, "*McDonnell Douglas* burden-shifting [remains] a viable option for pursuing employment

discrimination claims." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 629 (7th Cir. 2018). *McDonnell Douglas* offers a burden-shifting framework to be applied in proving employment discrimination under Title VII. To establish a *prima facie* case of discrimination under *McDonnell Douglas*, a plaintiff must show that: "(1) he belongs to a protected class; (2) he met Defendant's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably." *Rogers v. DeJoy*, 2021 WL 4318083, at *4 (N.D. Ill. Sept. 23, 2021); *Gamble v. Fiat Chrysler Autos*. U.S. L.L.C., 993 F.3d 534, 537 (7th Cir. 2021). Once the plaintiff has satisfied each element of a *prima facie* case, "the burden shifts to the employer to offer a non-discriminatory motive, and if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Gamble*, 993 F.3d at 93.

  First, the Court notes that the parties have many factual disputes. This Court must consider whether there are any *material* factual disputes at the summary judgment phase. However, in employment contexts, at-will employees employees may be fired for *any reason* and *no reason* at all, as long as that reason is not a statutorily protected reason i.e., race, age, or sex. *Thakkar v. Station Operators Inc.*, 697 F. Supp. 2d 908, 929 (N.D. Ill. 2010).

  There is no dispute that Young is African American and therefore belongs to a protected class. Further, he was terminated, and therefore suffered an adverse employment action. However, the Court sees no evidence of racial discrimination. As PTS notes, *all* of Young's colleagues at the Transportation and Security Department at the time of his termination were African American. Additionally, Mr. Jackson, the individual who hired and fired Young was African American.

  First the Court considers whether Young was meeting PTS's legitimate employment expectations. The Court finds that Young has not raised a genuine dispute of material fact

concerning his failure to meet PTS's legitimate expectations. While PTS indicates he was a great employee initially, after six months his performance declined. First, Mr. Fiedler, Young's driving partner, and other coworkers witnessed Young's stops to car dealerships, smoking marijuana during work, and drinking alcohol.[3] Young provides only conclusory allegations that he was meeting expectations. In fact, his response is filled with issues and concerns he was having with Mr. Jackson and other employees. For example, Young states that "Patrick Jackson terminated my employment based off of retaliation due to me threatening to go to HR on several occasions, my not participating in outside activities at his home that I was invited to, me building a relationship with the General Manager Andy Halencak & the fact that Patrick told Corey Dent that he couldn't trust me." (Doc. 49 at 1-2). His claims do not allege racial animus and discrimination. His response does not show that he was meeting expectations, and in his responses, Young details grievances he was having with leadership and other employees. *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010) ("[M]ere conclusory allegations do not constitute evidence."). It is clear that Young disagrees with the claims that he was not meeting the expectations of the job. Disagreement, however, "does not mean that the evaluations were the result of unlawful discrimination." *Dickerson v. Bd. of Trustees of Cmty. Coll*. Dist. No. 522, 657 F.3d 595, 603 (7th Cir. 2011).

Young indicates that he was recommended for a promotion in "bottling" by Mr. Halencak which shows he was at least meeting expectations. However, Young does not indicate when this recommendation was made. And further, PTS already admits Young received positive performance reviews in his first six months when he started in 2019. However, his performance

---

[3] Young responds to these allegations regarding Mr. Fiedler by stating he did go to a dealership in Rockford while at lunch. (Doc. 49 at 3-4). However, he also said that Fiedler did the same thing, went to a dealership and bought a sports car. He provides no evidence to this and makes a conclusory statement. Additionally, he states that "I never smoked marijuana, watched pornography, or drank alcohol in company van."

worsened after six months. Even if the Court provides a reasonable inference in favor of Young and determines that this recommendation occurred after the six months, it is clear Mr. Jackson was Young's supervisor and was dissatisfied with Young's performance in the job. Additionally, if the recommendation was during his first six months, the recommendation would constitute a past performance, and the Court must look at Young's performance at the time of his termination. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (past positive evaluations do not guarantee future employment…[n]or does such evidence, without more, show discrimination."); *see also Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1113 (7th Cir. 1998) ("Certainly, earlier evaluations cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken."). Even Young states that he was "friends" with his co-workers, and that eventually changed. This evidence does not provide a material dispute as to whether he was meeting PTS's reasonable job expectations.

Next, the Court has reviewed the exhibits and text messages Young has attached to his response. Some messages are without context and confusing to read. None of the evidence Young demonstrates he was meeting the expectations of his employer. The Court finds that his conclusory allegations do not translate into a *prima facie* case under the *McDonnel Douglas* framework based on the fact Young was meeting the reasonable expectations at work.

Next, the Court considers whether Young provides enough of similarly situated employees outside his race that were treated more favorably. Young presents evidence of Mr. Fiedler, who is white, as a comparator, because Mr. Fiedler was transferred out of the Security and Transportation Department and he was not given the same opportunity. In general, a comparator must have 1) dealt with the same supervisor, 2) been subject to the same standards, and 3) engaged in similar rule or policy violations. "Similarly situated employees must be 'directly comparable' to the

plaintiff 'in all material respects." *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). This is not a "magic formula," however, and the similarly-situated inquiry should not devolve into a mechanical, "one-to-one mapping between employees." *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012). Mr. Fiedler and Young have the same supervisor and had the same role, and therefore were subject to the same standards.

However, the record does not demonstrate that Mr. Fiedler engaged in a similar or policy violation and subsequently was treated more favorably over a similar violation as Young. Mr. Fiedler had communicated with HR over an issue with another colleague Ms. Edwards, made it clear to PTS that he wanted to work in the Cultivation Department, and that transfer was approved. The Court does not see how Mr. Fiedler is an adequate comparator for racial discriminatory purposes. The differences in the treatment can be explained by other factors such as his request to transfer, and issue with Ms. Edwards, his driving partner. Young does not adequately explain how they are similarly situated other than stating that he was not given the same opportunity with HR and transfer as Mr. Fiedler. *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) ("the comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories"). The Court finds the difference in treatment can be explained by other reasons such as a genuine interest in transferring departments and Mr. Fiedler's issue with another colleague requiring transfer, and not for discriminatory behavior. *See e.g., Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993) ("[A] pattern, in which blacks sometimes do better than whites and sometimes do worse, being random with respect to race, is not evidence of racial discrimination.").

The Court finds that Young has not demonstrated a *prima facie* case for race discrimination claim under Title VII and Illinois Human Rights Act. Young did not demonstrate a material dispute

that he was meeting PTS's legitimate employment expectations and that Mr. Fiedler was treated more favorably for similar policy violations. The Court finds that the evidence, viewed in the evidence most favorable to Young, did not reveal any prejudice towards African Americans. ("Igasaki did not identify any similarly situated employee who received more favorable treatment than he did. The district court added that the evidence, viewed in the light most favorable to Igasaki, did not reveal any prejudice against Asians, gay men, or older employees."). *Igasaki*, 988 F.3d at 954.

Because the Court finds that Young does not establish a *prima facie* case under *McDonnell Douglas*, it need not shift the burden to the employer. *See Chatman v. Bd. of Educ.*, 5 F.4th 738, 747 (7th Cir. 2021) ("It is not always necessary to march through this entire process if a single issue proves to be dispositive."). However, the Court finds that Young has not presented enough evidence to allow a jury to find in his favor under the alternative of the *McDonnell Douglas* approach. Based on the totally of the evidence, the Court finds that Young recites a litany of issues and complaints with his supervisor Mr. Jackson and his colleagues. His evidence attempts to disprove their claims he smoked marijuana, drank alcohol, and took personal visits to car dealerships. However, even one non-discriminatory reason can be enough to terminate Young, as long as that reason was not on the basis of his race. *Igasaki.*, 988 F.3d at 958 (finding plaintiff's litany of past wrongs of mandatory tasks made voluntary for others, increased workload, constant admonishment, arbitrary remote work, and general harsh treatment is not enough to show that department terminated him because of his Asian ethnicity or homosexuality). The Court finds the record shows no material dispute that Young's race played a discriminatory role in his termination.

Generally, this fact-bound element is difficult for a plaintiff to survive in defending a summary judgment motion, much less satisfy on its own motion for summary judgment. The Court

finds that Young does not meet this standard. *See Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 732 (7th Cir. 2009) (court holding the plaintiff's Title VII claim failed as a matter of law despite her allegations that she was called a "dirty Mexican"); *Chaparro v. City of Chicago*, 47 F.Supp.3d 767, 777 (N.D.Ill. 2014) (in granting defendant's summary judgment motion, court noting that being "lured" into a media-work room to watch video of a woman performing fellatio did not unreasonably interfere with plaintiff's work environment).

The legal analysis for discrimination claims under Title VII and Section 1981 is largely identical. *Lewis v. Indiana Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). For a Section 1981 claim, however, "a plaintiff bears the burden of showing that race was a but-for cause of [her] injury." *Id.* (internal citations omitted). Because Young does not prevail under the Title VII analysis, he does not succeed on his Section 1981 claim based on racial discrimination.

b. **Title VII, Illinois Human Rights Act, and Section 1981 – Retaliation** [4]

Next, the Court reviews whether Young survives summary judgment regarding his retaliation claims. In order make out a *prima face* case for retaliation under the burden-shifting method, Young must demonstrate that: (1) he engaged in statutorily protected activity; (2) he suffered a materially adverse action; and (3) there is a but-for causal connection between the two events. *Kluge v. Brownsburg Cmty. Sch. Corp.*, 64 F.4th 861 (7th Cir. 2023). The causation standard in retaliation claims is more stringent than the standard in discrimination claims. *Id*.

The Court finds that Young's claims fail because he did not participate in "statutorily protected activity." While Young's response states that PTS "retaliated" against him multiple times, the Court finds that no reasonable juror could find that Young engaged in statutorily

---

[4] Because the analysis for a retaliation claim under Title VII tracks the analyses for retaliation claims under section 1981, section 1983, and the IHRA, we need not separately discuss those statutes. *See Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (section 1981); *Nicholson v. City of Peoria*, 860 F.3d 520, 523 (7th Cir. 2017) (section 1983); *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 382–83 (7th Cir. 2016) (IHRA).

protected activity. "A complaint of discrimination is a protected activity under Title VII only if the discrimination is based on a protected characteristic like race." *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021). The Court finds no evidence in the record that Young complained of racial discrimination. Young states that he was terminated "based off retaliation due to me threatening to go to HR on several occasions, my not participating in outside activities at his time that I was invited to, me building a relationship with the General Manager Andy Halencak…" (Doc. 49 at 1-2). However, Young also alleges that he had a conversation with Mr. Halencak regarding Mr. Fiedler's transfer to the Cultivation Department. Young's response and these conversations do not indicate he complained to HR over race discrimination and are therefore not statutorily protected activity. "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021) ("Miller stated that he felt he was being "targeted" and treated unfairly by Bonds, but his EEO complaint to Kapadia did not mention a reason for this treatment and certainly did not attribute it to race. Without evidence that he engaged in statutorily protected activity, no reasonable jury could have found for Miller on his retaliation claims.").

      The Court finds that Young does not demonstrate a material dispute regarding a *prima facie* case of retaliatory behavior under Title VII, Illinois Human Rights Act, and § 1981 because there is no evidence in the record, or the parties' responses Young engaged in statutorily protected activity.

### c. Illinois Biometric Privacy Act Claim

The Illinois Biometric Information Privacy Act protects an individual's interest in biometric data. 740 ILCS 14/1 et seq. The Illinois General Assembly enacted BIPA in 2008 in response to the increasing use of biometric data in commercial settings. See 740 ILCS 14/5(a)–(b), (d). PTS moves for summary judgment based on Young's allegations that PTS "never informed Plaintiff in writing that his biometric identifiers and/or biometric information were being collected, captured, stored, and/or used, nor did Defendant inform Plaintiff in writing of the specific purpose(s) and length of term for which his biometric identifiers and/or biometric information were being collected, stored, used, and disseminated as required by 740 ILCS 14/15(b)(1)-(2)." (Doc. 34, ¶ 101).

PTS puts forth evidence that Young signed his voluntary consent for use of his biometric identifiers prior to Young's use of the clock. SOF at ¶ 59. Young does not address this claim in his response, nor does he put forth any evidence that he did not provide voluntary consent, or withdrew consent at any time. Therefore, the Court finds that there is no material dispute as to this claim.

### V. Conclusion

The Court hereby **GRANTS** Defendant Progressive Treatment Solutions, LLC (Doc. 46). Plaintiff LaMonte R. Young, Sr.'s complaint is **DISMISSED** with prejudice. The Court **DIRECTS** the Clerk of the Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**Dated: April 24, 2023**

/s/  J. Phil Gilbert
J. PHIL GILBERT
DISTRICT JUDGE